UNITED STATES of America,
Plaintiff-Appellee,

v.

William NETTERVILLE, Gerald L. Thatcher, Robert Douglas Watkins, and Donald Byrd Chambers, Defendants-Appellants.

No. 76–1670.

United States Court of Appeals,
Fifth Circuit.

June 9, 1977.

Rehearings Denied July 8, 1977.

904

William N. Netterville, pro se.

James H. Martin, Dallas, Tex., for Chambers.

Emmett Colvin, Jr., Gary D. Jackson, Dallas, Tex., for Thatcher.

Melvyn Carson Bruder, Dallas, Tex., for Netterville.

Cecil Emerson, Dallas, Tex., for Watkins.

Michael P. Carnes, U. S. Atty., John W. Sweeney, Jr., Asst. U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before COLEMAN, AINSWORTH and INGRAHAM, Circuit Judges.

AINSWORTH, Circuit Judge:

This criminal case involves a 13-count conspiracy indictment against several defendants charging violations of 18 U.S.C. § 1341,[1] relative to use of the United States mails to defraud. The present appellants, Robert Douglas Watkins, Donald Byrd Chambers, Gerald Thatcher and William Netterville, and others, were charged in the indictment with use of the mails in the execution of a scheme to defraud and obtain money by means of false pretenses from persons induced to purchase oil products dealerships. The jury returned verdicts of guilty on at least some counts against each of the four appellants. Their appeal contends that the evidence at the trial was insufficient for the jury to find a conspiracy; that the evidence was insufficient to support convictions on various substantive counts; that they were denied their right to speedy trial; and other errors. We find these assertions to be without merit and affirm the judgment below.

Todd Van Note, Charlie Sheppart and Howard Eugene Mason incorporated Diversified Marketers, Inc., or DMI, on July 21, 1971. Defendant Watkins became vice president of DMI and defendant Chambers sales manager.

According to Van Note's testimony, the purpose of the company was to sell automotive filters through a network of consignment dealers. To acquire dealers DMI placed classified ads in newspapers. Interested potential dealers were to call a Dallas telephone number, at which they reached the DMI offices. Callers were told that they would be contacted by a salesman; the home office would then refer the names of the callers to salesmen in the field, who would contact the callers personally. The presentations made by the salesmen were based upon promotional materials including a sales manual compiled by Van Note and Chambers.

---

1. The text of 18 U.S.C. § 1341 follows:

 *Frauds and swindles*

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Several prospective dealers who were given the sales presentation appeared as witnesses at the trial. According to their testimony the salesmen represented that for about $3,000 paid in advance they would be granted a dealership, that inventory would arrive within three to six weeks, and that fifteen (sometimes more) retail locations would be arranged for them. Should a dealer become dissatisfied, DMI guaranteed to buy back any unsold inventory at a small discount. The sales manual contained a list of allegedly successful dealers whom the prospect could contact by telephone. Among the names listed was that of "Don Mason." The telephone number listed for "Mason" actually reached defendant Netterville, who played the part of the fictitious dealer and made what one witness described as "quite enthusiastic" false claims concerning the success of his "distributorship." Several witnesses testified that calls which they made to such numbers provided by salesmen were influential in their decisions to apply for dealerships.

Prospective dealers who were persuaded by the sales presentation would sign dealership agreements, and execute checks as advance payment. The signed agreements and checks would be sent, often by mail, to DMI in Dallas. Watkins would evaluate and "accept" the new dealer, execute a contract and repurchase agreement, and mail these and a welcoming letter back to the new dealer.

The money received from new dealers was supposed to be used to purchase and ship inventory and sales materials, and to establish retail locations for the new dealer, according to Van Note's testimony. Instead the money was used to pay the day-to-day operating expenses of DMI (and later of ICU). By February of 1972, however, DMI "reached a point where our overhead was ahead of our income," Van Note testified. When cash could not be raised through bank loans or through individual investors, it was decided, upon Chambers' suggestion, to form a new corporation which could provide cash. Accordingly,

ICU Corporation was formed on February 11, 1972. Van Note, Watkins and Chambers were the incorporators. Chambers was president and Watkins was vice president. ICU was operated as a consignment dealership program similar to DMI except that the products involved were different—oil additives, automotive waxes and polishes, and other products, instead of filters. Van Note testified that Chambers was "basically in charge of putting the packet together" for ICU's promotion and sales.

At about the time ICU was being formed DMI retained Jack Howard and Associates, a Dallas advertising firm, to assist in recruiting new dealers. Roy Stamps, who handled the account for Howard, testified that between January and August of 1972 DMI and ICU spent about $190,000 on advertising for new dealers. He testified that Chambers, Watkins and Van Note participated in preparing the ads, and that Van Note had final say. The ads were placed in newspapers "in almost every state in the Union," Stamps testified. A typical DMI newspaper ad which appears in the record said:

> DISTRIBUTOR NEEDED. Be in business for yourself, full or part time, for twenty one year old auto products company. No direct selling. Service dealers only. Economy does not affect our business. Profit potential is extraordinary. Inventory secured with a guaranteed buy-back. Phone collect, Mr. Peters, area code 201–343–7771.

A similar ad for ICU described that company as sixty years old. Stamps testified that he felt these descriptions to be ethical even though the two companies were each less than one year old, because the products which they distributed bore trademarks or copyrights which were respectively 21 and 60 years old.

As early as December of 1971 DMI was experiencing "backlogging" difficulties in the shipment of promised merchandise to dealers, according to the testimony of one employee. By February of 1972 the two corporations were making agreements which they were unable to honor; merchan-

dise was in some cases not shipped and the buy-back agreements were not honored. After "acceptance" new dealers began to be advised by letter that DMI had "filled its quota" of new dealers and that no additional dealers would be employed; the prepayments made by such dealers were in many cases not returned. Nevertheless, DMI and ICU continued to solicit new dealers— Stamps testified that he was doing business amounting to $5,000 to $6,000 weekly with the DMI/ICU account—and to enter into additional agreements with prospective dealers until August of 1972. The corporations continued to encourage and to attempt to mollify its dealers, often by letter, until as late as October, 1972. Some dealers received small amounts of their investment back, and others received nothing.

On April 11, 1974, a 13-count mail fraud and conspiracy indictment was returned naming Van Note, Oliver B. Kochs, and the present appellants. Trial was set for June 10, 1974, but the date was passed to allow the grand jury to return a superceding indictment. The new indictment (which differed from the original indictment only as to the number of counts under which certain defendants were charged) was handed down on June 26, 1974. The elements alleged as false or fraudulent in the indictment included the representation as to the ages of the companies, the agreement to repurchase, the guarantee of locations, the promise to deliver merchandise within three to six weeks, claimed profit expectancy of $90 per day (included in some ads but not all), and the use of Kochs and "Mason" as bogus established dealers or "singers." Counts 1 through 12 of the indictment named various defendants as actors in perpetrating the alleged fraud against specific prospective dealers, either by using the mails to send them contracts or by causing them to use the mails to send their prepayment checks to DMI or ICU. Count 13 alleged a conspiracy to conduct the fraudulent scheme by mail.

Trial was set for December 16, 1974, but was postponed when Kochs suffered a heart attack on December 14.

Van Note pleaded guilty to Count 1 of the indictment and, after sentencing, was dismissed from the cause on September 29, 1975.

Trial was set for December 1, 1975, but docket and witness complications caused its postponement until January 26, 1976. Kochs was severed from the cause due to his continuing heart ailment. He was too ill to appear at trial and died shortly afterward.

On February 6, 1976, the jury returned verdicts of guilty against each of the four remaining defendants. All were found guilty on Count 13, the conspiracy count. Watkins was convicted on 10 substantive counts alleging mail fraud. Chambers was found guilty on one of five substantive counts in which he was named. Netterville was found guilty on both substantive counts naming him, and Thatcher on five of seven. Watkins was sentenced to a total of eight years' imprisonment; Chambers received two concurrent five year terms; Thatcher received a total of seven years, and Netterville received three concurrent five year terms. All four appeal their convictions.

On appeal each of the appellants complains that he was denied a speedy trial. Each challenges the sufficiency of the evidence relating to the conspiracy count and to the substantive counts on which he was convicted. Thatcher and Netterville assert that an erroneous instruction as to intent was given to the jury. Thatcher and Watkins complain of admission of evidence of allegedly extraneous offenses. Chambers contends that certain conduct by the prosecutor during the trial was prejudicial. We find all of these points of error to be meritless.

*The conspiracy count*

■ In order for us to sustain appellants' convictions for conspiracy, the proof must be sufficient to show that two or more persons conspired for an illegal purpose. The illegal purpose alleged by the government in this case is mail fraud; the ele-

ments of mail fraud are a scheme to defraud, and use of the mails in execution of the scheme. Altogether, the proof must show a conspiracy to defraud, in execution of which the mails are used. As seen below, the proof was adequate to satisfy each of these elements.

■ When the sufficiency of the evidence to convict is challenged, we must sustain the guilty verdict if it is supported by substantial evidence taking the view most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1944). "The essential elements of a conspiracy are an agreement by two or more persons to combine for an illegal purpose and an overt act by one member in furtherance of the agreement;" *United States v. Lowry,* 5 Cir., 1972, 456 F.2d 341, 344; *see* 18 U.S.C. § 371. Direct proof of the agreement is not required. As we have said,

> Since a conspiracy by its very nature is born and clothed in secrecy, the first element of the offense—agreement—is seldom susceptible of direct proof. Proof of the agreement or common purpose therefore must rest upon inferences drawn from relevant and competent circumstantial evidence—ordinarily, the acts and conduct of the conspirators themselves.

*United States v. Warner,* 5 Cir., 1971, 441 F.2d 821, 830, *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

That the four appellants associated in a single scheme involving DMI and ICU is clear from the facts. Van Note operated DMI; he hired Watkins and Chambers; Chambers hired Netterville and Thatcher with Van Note's approval. Van Note, Chambers and Watkins incorporated ICU. Thatcher worked for both companies. Netterville pretended to be "Don Mason" for callers interested in dealerships with both companies.

■ The illegal purpose alleged by the government is mail fraud under 18 U.S.C. § 1341. "The essential elements of an offense under the mail fraud statute are '(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme.' *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954)." *United States v. Melvin,* 5 Cir., 1977, 544 F.2d 767, 773. The statute "condemns any scheme to defraud in which the mails are employed," *id.*

■ In order to constitute a "scheme to defraud" the scheme must be shown to be

> reasonably calculated to *deceive* persons of ordinary prudence and comprehension. The intent of the crime is shown by the scheme itself—here, the active promotion of a company known to be inescapably insolvent by making impossible representations of possible wealth to potential investors,

*United States v. Bruce,* 5 Cir., 1973, 488 F.2d 1224, 1229, *cert. denied,* 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974) [emphasis in the original].

■ In the present case, the classified advertising used by DMI and ICU to attract prospective dealers is false in some respects and in others so misleading as to amount to a falsehood. Ads promising that all inventory would be "secured" by the buy-back guarantee continued to run until August, 1972, although no buy-back guarantee was honored after January of 1972, according to Van Note. The ads promised delivery of inventory within a certain time, as short as three to six weeks, but Van Note testified that as early as January of 1972 DMI was having "difficulties" supplying inventory; several witnesses testified that they received no inventory at all. The ads promised that retail locations would be arranged, but dealers who appeared as witnesses testified that they received no locations and no effort was made to arrange locations for them. The ads referred to "extraordinary" profit potential, but there is no indication that any experience existed on which such a claim could be based. Finally, the ads represented that DMI was 21 years old and ICU was 60 years old. We need not decide whether, as Stamps testified, these assertions were "ethical" in light of the age of the trademarks or copyrights securing the products being sold. These representations

as to the ages of the companies give the unmistakable impression that the other claims in the ads are based upon decades of dealer experience, while in truth the claims were baseless, as we have seen. Thus, the representations as to the ages of the companies in conjunction with the balance of the matter in the ads were grossly misleading. Taking all of these factors together we find that the ads were false. Intent to deceive can be inferred from the fact that the ads continued to run months after DMI and ICU had ceased honoring the promises made in the ads, and after they had lost the ability to honor the agreements due to insufficient cash flow. The jury could correctly find, therefore, that the ads were part of a scheme to defraud under section 1341.

The buy-back guarantee already discussed was repeated by salesmen in personal presentations to prospective dealers, and a memorandum of the agreement was executed at company headquarters and returned to the new dealers. In light of what has already been said concerning the buy-back agreement and in light of the emphasis placed upon it by the companies in recruiting new dealers, the buy-back agreement could correctly have been found to be part of a scheme to defraud.

In addition to the buy-back agreement, other portions of the salesmen's presentation were false. For example, the presentations included representations that DMI had 300 successful distributors, that earnings of $25,000 per year were assured, and that profits could amount to 55 cents on the dollar. False representations made in the classified ads as to arrival time of inventory, guaranteed retail locations, and that the companies would provide a lifetime bookkeeping system were repeated by the salesmen. In this manner prospective dealers were intentionally deceived into believing that they were dealing with established companies which would take steps to reward their investments and to keep their investments secure. The jury could correctly find that the salesmen's presentations were a part of a scheme to defraud.

Included in at least some of the presentations, and available in the sales manuals, were names and telephone numbers which prospective dealers were told were those of successful dealers; prospective dealers were invited to contact them to discuss the investment. In fact, at least two of these "established dealers" were bogus. One, "Don Mason," did not exist at all. His telephone number reached Netterville, who identified himself as "Mason" and made extravagant, false claims for the success of the "Mason" dealership. The other was Kochs; Kochs was a real person but, as his affidavit shows, he was never a DMI or ICU dealer. He was hired to represent himself as a successful dealer. We conclude that the jury could find from the evidence that the intentional deception of prospective dealers concerning the success of the "Mason" and Kochs dealerships was part of a scheme to defraud.

In sum, the jury correctly found that in using false representations to recruit new dealers, and in making agreements with the new dealers which they would be unable to fulfil, the operators of DMI and ICU were conducting a scheme to defraud.

The mails were employed as "an integral part of the scheme to defraud," *United States v. Melvin, supra,* 544 F.2d at 775. Many prospective dealers' checks and signed agreements were mailed to DMI or ICU. Executed dealership contracts, buy-back agreements and letters of welcome were mailed from DMI and ICU to new dealers. After the scheme began to collapse, mollifying letters and other assurances were mailed to dealers; *see United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974).

From the foregoing the jury correctly found that the DMI and ICU consignment dealership operations constituted a conspiracy to obtain money by means of false or fraudulent representations or promises, by using or causing the mails to be used—in other words, a mail fraud conspiracy according to the terms of section 1341.

■ Watkins' argument that the DMI/ICU scheme constituted not one but

two conspiracies so that a fatal variance exists between the indictment and the proof is without merit. *See, e. g., United States v. Perez,* 5 Cir., 1973, 489 F.2d 51, 62, *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974).

Having established to the jury's satisfaction the elements of a mail fraud conspiracy, it remained for the government to adduce evidence to show each of the appellants' "knowing participation" in the conspiracy, *United States v. Oliva,* 5 Cir., 1974, 497 F.2d 130, 133. "Proof of agreement in conspiracy trials must usually rest on the inferences to be drawn from circumstantial evidence," *id.* at 134; *see United States v. Warner, supra,* 441 F.2d at 830. The "necessary agreement to commit criminal acts" must be shown by something more than "mere proof of association with one 'bad man,'" *United States v. Oliva, supra,* 497 F.2d at 134. *See United States v. Owen,* 5 Cir., 1974, 492 F.2d 1100, 1103–09, *cert. denied,* 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974). "In this circuit only slight evidence is required, for purposes of appellate review of conspiracy cases, to connect a particular defendant with a conspiracy, once the conspiracy is shown." *United States v. Binetti,* 5 Cir., 1977, 547 F.2d 265, 267. That evidence must show that the defendant wilfully associated himself with the criminal venture, participated in it, and sought by some act to make it succeed. *Id.,* at page 267.

Watkins, hired by Van Note in "August or September" of 1971, was described by Van Note as his "right arm." Watkins was vice president of both companies and an incorporator of ICU. It was Watkins who approved the new dealers' contracts and buy-back agreements and mailed them to the dealers with an encouraging letter. He was responsible for arranging shipment of merchandise to DMI and ICU dealers. He was contacted in person by dissatisfied dealers. Because of his involvement in accepting new dealers and in shipping merchandise, he could not escape knowing that the DMI and ICU contracts were not being honored. Watkins testified that he was aware of the companies' difficulties in meeting their obligations concerning merchandise in the late spring of 1972; and that he was aware that merchandise was not being shipped to some dealers because the companies lacked the necessary funds. Nevertheless, he continued to approve additional dealer contracts and buy-back agreements as late as August of 1972. Enough has been said to show that "the defendant's actions here went beyond mere association," *United States v. Binetti, supra,* at page 268, and provided a basis for the jury to find that Watkins knew of the scheme to defraud and wilfully acted in a manner calculated to make it succeed, *id.*

Chambers was hired by Van Note at about the same time as Watkins. As sales manager at DMI, Chambers hired the salesmen and furnished them with the material for their sales presentations, including the names of bogus "successful dealers." Chambers was instrumental in formulating the false and misleading advertising discussed earlier, according to Stamps. It was Chambers who suggested the formation of ICU and Chambers who prepared the promotional materials for that company. Van Note testified that Chambers knew that DMI was behind in meeting its commitments to dealers as early as January, 1972. He further testified that it was because there was insufficient cash flow to meet overhead that Chambers suggested forming ICU. Chambers' actions clearly went beyond "mere association", and the jury correctly found that he knew of the scheme and actively furthered it.

Thatcher was hired to be a salesman for DMI; later he became sales manager for ICU. As a salesman he "sold" three new dealers who appeared as witnesses; each testified that he made the false promises and representations to them which are discussed above. Thatcher recruited several of the bogus "successful dealers" whose telephone numbers he and other salesmen gave to prospective dealers. Checks payable to "Don Mason" were deposited to Thatcher's bank account. Again, the jury correctly concluded that Thatcher must

have known of the scheme and actively furthered it.

 Netterville asserts that he was recruited by Van Note to manage the "Don Mason Service Company" which was to serve as a distributorship for the Dallas-Fort Worth area. While the Don Mason Company was being organized, Van Note asked Netterville to answer a certain telephone, and to give any telephone callers certain information concerning the success of the Don Mason operation. Netterville testified that he was provided with information to read, and that he simply read it having no way of knowing whether it was true or false. Witnesses testified, however, that Netterville represented himself as Mason when called, and played the part with "enthusiasm." Another witness, a postal inspector who interviewed Netterville in connection with this case, testified that Netterville told him that he told callers about money and sales which he anticipated making. Netterville, then, understood that he was deceiving the people who telephoned him. Netterville introduced at least one prospect, Lynn Rountree, to Van Note. Rountree bought a "double" dealership. The jury could correctly infer that Netterville understood from the nature of the calls and the content of his false representations that he was furthering a fraudulent scheme. *See United States v. Morrow,* 5 Cir., 1976, 537 F.2d 120, 126. He did so in association with Van Note, the principal orchestrator of the scheme. It was not necessary that Netterville know of all facets of the scheme or know all of the other conspirators. *United States v. Rodriguez,* 5 Cir., 1975, 509 F.2d 1342, 1348. Netterville's conscious falsehoods went beyond "mere association" and the jury correctly found that he knew of the scheme and wilfully acted to further it. Once a defendant becomes associated with a conspiracy he is responsible for all acts of the conspiracy, *United States v. Dearden,* 5 Cir., 1977, 546 F.2d 622, 625, even though the acts occurred before or after his association with the conspiracy, *id.; see United States v. Heathington,* 5 Cir., 1977, 545 F.2d 972, 973.

 In sum we find that the jury was justified in finding that a conspiracy existed and that Watkins, Chambers, Thatcher and Netterville each knew of the scheme and wilfully acted to further it and that the mails were used in execution of the scheme. We therefore affirm the conviction of each appellant under Count 13 of the indictment.

*Speedy Trial*

All four appellants appeal the trial judge's denial of their pretrial motion to dismiss for lack of speedy trial. The trial judge heard the motion at length, taking testimony from the appellants, their lawyers, the prosecutor, and other witnesses, and determined that under the circumstances dismissal was not required. We have carefully reviewed the transcript of the motion hearing and agree with the conclusion of the trial judge that the appellants were not denied their right to a speedy trial, and that their motion to dismiss on this ground should have been denied.

The due process clause of the fifth amendment protects defendants from unreasonable delay preceding commencement of prosecution. The sixth amendment protects against unreasonable delay between the commencement of prosecution and trial. We treat the appellants' briefs as raising both issues, and find no merit in them.

*Delay preceding prosecution.* As to delay preceding prosecution, we have said,

> Absent a showing of extreme prejudice amounting to a Fifth Amendment denial of due process, the commencement of prosecution is controlled exclusively by the applicable statute of limitations.

*United States v. Davis,* 5 Cir., 1973, 487 F.2d 112, 116.

> The pre-accusation delay would constitute a violation of the appellants' due process rights if they could show (1) that they incurred substantial prejudice as a result of the government's delays and (2) that the prosecution had intentionally employed the delay to gain a tactical advantage.

*United States v. Avalos,* 5 Cir., 1976, 541 F.2d 1100, 1107.

 In the present case there is no allegation that prosecution was not commenced within the applicable limitations period. Therefore, in order to prevail on this issue the appellants must show, at least, "extreme prejudice."

 The investigation into this case began in October or November, 1972 according to Postal Inspector Teel, who conducted it. The original indictment was returned April 11, 1974. Thus a period of eighteen or nineteen months elapsed between commencement of the investigation and indictment. The indictment charged culpable acts occurring as early as December 16, 1971 so that indictment followed these acts by as long as thirty months. Nevertheless the appellants in their briefs refer to no specific prejudicial factors arising as a result of this delay. The three appellants who appeared at the motion hearing each testified that postal inspectors and police alerted them to the existence of the investigation almost as soon as it was begun. The tenor of the testimony of these appellants and of their lawyers at the hearing was that they were satisfactorily prepared to proceed at the first trial setting in June, 1974. It is apparent that the pre-indictment delay did not prejudice appellants' preparation of a defense. They do not attempt to show any intentional employment of delay on the part of the government calculated to gain tactical advantage. Thus, the pre-indictment delay did not violate their due process rights under the fifth amendment.

 *Delay following commencement of prosecution.* Next we must determine whether the appellants' sixth amendment rights were prejudiced by the delay between commencement of prosecution and trial. *See Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 303–04, 46 L.Ed.2d 205 (1975); *United States v. Palmer,* 5 Cir., 1976, 537 F.2d 1287, 1288–89. The Supreme Court has recognized the sixth amendment as "an important safeguard to prevent un-

due and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971), *quoting United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). In determining whether the appellants' sixth amendment rights were violated, we are governed by the balancing test of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We have said that pursuant to the *Barker* test

> the conduct of the prosecution and the defendant is balanced, on an *ad hoc* basis, giving particular attention to four factors: (i) length of delay, (ii) the reason for the delay, (iii) the defendant's assertion of his right, and (iv) prejudice to the defendant.

*United States v. Davis, supra,* 487 F.2d at 117. "The test is more suggestive than exhaustive, and this Court has found implicit in *Barker* other factors to be thrown into the balance" including the complexity of the case and the availability of evidence. *United States v. Avalos, supra,* 541 F.2d at 1110.

 *Length of delay.* The length of the delay involved must be sufficient to be "presumptively prejudicial," otherwise "there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo, supra,* 407 U.S. at 530, 92 S.Ct. at 2192. The length of delay is usually computed from the time that financial, social and psychological prejudice may begin to accrue to an accused. *United States v. Marion, supra,* 404 U.S. at 320, 92 S.Ct. at 463; *see Dillingham v. United States, supra,* 423 U.S. at 64–66, 96 S.Ct. at 303–04. The present appellants date their alleged prejudice from the return of the first indictment on April 14, 1974. For present purposes we shall adopt the same date.

 Trial commenced on January 26, 1976. All parties waived any speedy trial objection, however, for the period between

**914**

December 1, 1975 and January 26, 1976.[2] The length of the delay to be considered is thus April 14, 1974 until December 1, 1975 or 19 months and 2 weeks. Accordingly, there is sufficient delay to require inquiry into the other *Barker* factors.

■ *Assertion of the right.* Sixth amendment rights are fundamental in nature so that a failure to assert them does not constitute waiver. *Prince v. Alabama,* 5 Cir., 1975, 507 F.2d 693, 700–701. However, the timeliness and vigor with which the right is asserted may be considered as an indication of whether a defendant was denied needed access to a speedy trial over his objection, or whether the issue was raised on appeal as afterthought. *Barker v. Wingo, supra,* 407 U.S. at 528–29, 534, 92 S.Ct. at 2191, 2194: *United States v. Avalos, supra,* 541 F.2d at 1115. In *Barker* the Supreme Court said that courts may, for example,

> attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client, or from a situation in which no counsel is appointed. It would also allow a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely *pro forma* objection.

407 U.S. at 529, 92 S.Ct. at 2191.

Thatcher waited to assert his speedy trial right until December 16, 1975; Watkins until January 22, 1976; Chambers until January 21, 1976, and Netterville until January 20, 1976.

At the motion hearing on January 22, 1976, Thatcher's position appeared ambivalent as to whether he would assert deprivation of the right to speedy trial or move for an additional 30-day stay to improve the possibility that Kochs, who was ill, could appear at trial. Finally, saying "we're not claiming any right to speedy trial," Thatcher's attorney moved for the stay. Netterville's attorney said that "Mr. Netterville is essentially in the same position as Mr. Thatcher, needing Mr. Kochs' testimony" and referred to this testimony as a "key to our defense." Netterville did not join Thatcher in moving for an additional stay; nevertheless the attitude of Thatcher and Netterville toward Kochs' testimony may help explain why they did not assert the speedy trial right at an earlier date: they were waiting for Kochs to get well so that he could testify.

Chambers did not make any appearance at the motion hearing and no evidence was adduced on his behalf.

Watkins did appear and present evidence at the hearing. We note, however, that Watkins' motion asserting his speedy trial right, which appears in the record, is dated January 22, 1976—the same day as the motion hearing.

In short the appellants, although represented by counsel during the entire pendency of this case, failed to assert their speedy trial right until the last possible moment, and then their assertions lacked vigor. We find that the record does not show that

> the appellants aggressively asserted that desire for speedy trial which they now urge has been thwarted. That fact will militate against a claim that speedy trial was denied.

*United States v. Avalos, supra,* 541 F.2d at 1115.

■ *Reasons for delay.* The trial judge at the motion hearing found that the delay between indictment on April 14, 1975 and the second trial date of December 16, 1974 occurred because the case was returned to the Grand Jury for a superseding indictment. The superseding indictment was handed down on June 26, 1974; arraign-

---

2. The transcript of the hearing on the motion to dismiss for lack of speedy trial shows that the trial judge herein designated another, older criminal case involving other defendants, for trial on December 1, displacing the present case. The prosecutor found that the next convenient time to assemble all witnesses and make other arrangements in the present case would be late January. All parties agreed to a continuance until January 26, and all agreed to waive any speedy trial complaint as to the period between December 1, 1975 and January 26, 1976.

ments under the new indictment took place on September 27. Trial pursuant to the indictment was scheduled for December 16, 1974. The trial judge found that as to this series of events and consequent passage of time there "was no speedy trial problem," that is, that this delay was "justifiable," not "negligent," or "deliberate." *See Barker v. Wingo, supra,* 407 U.S. at 531–33, 92 S.Ct. at 2192–93; *United States v. Avalos, supra,* 541 F.2d at 1111–14. Particularly in light of the complexity of this multi-state conspiracy case and of the number of defendants, we agree that this portion of the delay was justified.

■ As to the remaining period, that between December 16, 1974 and December 1, 1975, the trial judge found that the December 16 trial date was passed due to the heart attack of defendant Kochs on December 14. The trial judge took into account the complexity of the case and that the case was transferred from one prosecutor to another and finally to a third during that period. The trial judge noted that Kochs' attorney received letters from Kochs' physician to the effect that Kochs was in congestive heart failure and consequently unable to stand trial in June, 1975 and again in August, 1975; and that as of October, 1975 Kochs was still too ill to stand trial. Again we agree with the trial judge that these circumstances amount to justifiable delay. This delay should not weigh against the government, *United States v. Avalos, supra,* 541 F.2d at 1114.

*Prejudice to the appellants.* The Supreme Court has identified the interests to be protected by the speedy trial right as follows:

(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

*Barker v. Wingo, supra,* 407 U.S. at 532, 92 S.Ct. at 2193. None of the four appellants was incarcerated, so that the first interest was not compromised. Additionally, the freedom of all four appellants during the entire pendency of this action allowed each the maximum opportunity to prepare his defense.

■ Chambers, as already noted, did not appear at the motion hearing and no evidence was adduced in his behalf at the hearing. In his brief on appeal, Chambers refers to the length of time between the first indictment and trial, and observes in a general way that the passage of time "will impair witnesses [sic] memory" and that this may be true of some witnesses whose testimony would have benefitted Chambers. General allegations of "loss of witnesses and failure of memories is insufficient to establish prejudice." *United States v. Beckham,* 5 Cir., 1975, 505 F.2d 1316, 1319, *cert. denied,* 421 U.S. 950, 95 S.Ct. 1683, 44 L.Ed.2d 104. As to Chambers, then, the record shows no substantial prejudice as a result of the delay between indictment and trial.

■ Thatcher's brief on appeal asserts that his defense was prejudiced in two ways. First, "Appellant was deprived of the testimony of O.B. Kochs." We have already seen that Kochs suffered a heart attack shortly before the December, 1974 trial setting and, according to his physician, was too ill to stand trial during much of the succeeding year; and he suffered a second heart attack shortly before the trial of the case and was severed. It was not the delay which deprived Thatcher of Kochs, but the unavailability of Kochs which caused the delay. We do not credit this point of prejudice.

Thatcher further argues that "the accurate testimony of the persons involved in the acts, which occurred approximately four years previous to the trial, was denied by the delay." This is a "general allegation of loss of witnesses and failure of memories" and is insufficient to establish prejudice.

*United States v. Beckham, supra,* 505 F.2d at 1319.

▆▆▆▆ Thatcher's final allegation of prejudice involves what *Barker* characterizes as the "anxiety and concern of the accused" which the protection of the sixth amendment is intended to minimize. Thatcher claims to have lost his job and to have been unable to secure another; to have suffered severe financial hardship; and to have experienced severe family problems as a result of his indictment. These are complaints of the sort "present to some degree in virtually every case" and do not necessarily amount to actual prejudice, *United States v. Avalos, supra,* 541 F.2d at 1115, because they are the result of the indictment itself and not of the delay which followed the indictment. Prejudice may accrue when such suffering is "extended" by delay. *United States v. Beckham, supra,* 505 F.2d at 1320. Thatcher's tardiness and lack of vigor in asserting his speedy trial right, however, are inconsistent with his present complaints. His long silence "suggests that any hardships he suffered were either minimal or caused by other factors." *Palmer v. United States, supra,* 537 F.2d at 1288. Taking all of Thatcher's problems into account in light of his silence we find that they did not rise to the level of substantial actual prejudice.

▆▆▆▆ Watkins asserts that a witness, Joseph Kennedy, became unavailable to him because of the delay. He does not relate what evidence Kennedy would have offered. At the motion hearing, Watkins testified that despite retaining counsel in April, 1974 and despite being aware of the necessity of a defense during the entire pendency of this matter, he failed to keep in touch with Kennedy although he did keep in touch with other witnesses. Watkins testified that he realized that Kennedy might be helpful to him only a few weeks before trial. We cannot attribute the loss of this witness to delay.

Watkins further asserts that he was prejudiced by an unfavorable newspaper article which appeared shortly after his first indictment; and that shortly after the second indictment, as a result of his involvement in this matter, his wife divorced him. We agree with the trial judge that these circumstances occurred quickly, as a result of the indictment and were not the result of any delay.

Watkins finally asserts that the long pendency of this action has caused him severe financial and emotional strain, and that his social relationships have been impaired. Again, these problems were not caused by the delay but by Watkins' involvement in a criminal action. Like Thatcher, Watkins failed to assert his speedy trial right early or vigorously. As with Thatcher, we find that the record does not indicate that Watkins' asserted troubles amounted to "substantial actual prejudice."

▆▆▆▆ Netterville makes the strongest case among the appellants of prejudice to his defense. Netterville relates that one witness, Jameson Brinkmeyer, died during the pendency of this matter and that two others, Lynn Rountree and Ricky Cheung, became unavailable.

Netterville asserts that Brinkmeyer would have testified to a conversation in which Van Note allegedly implied or stated that he had "duped" Netterville into playing a role in the conspiracy. Van Note could have been questioned about this conversation, but was not. Further, Brinkmeyer died during the period for which speedy trial right was waived by all parties.

Netterville contends that Rountree, an ICU dealer, would have testified that only through Netterville's efforts did Rountree receive his inventory; and that Netterville told him that he had quit working for ICU because he "didn't like the way they were operating the company." Another witness, Shari Martin, testified concerning Netterville's resignation. Van Note could have been questioned concerning Netterville's efforts on Rountree's behalf. Thus, Rountree's testimony would have been cumulative. Further, Netterville testified that in 1975 he was in touch with Rountree; at that time he knew he was going to trial, and was represented by counsel, yet he failed to keep track of this witness. Net-

terville offers nothing to indicate that the delay caused him to lose touch with Rountree; he shows only that during the delay contact was lost.

Finally, Netterville asserts the loss of Ricky Cheung, his former employer, who Netterville believes returned to Hong Kong during the delay. According to Netterville, Cheung would have testified to a conversation in which Van Note recruited Netterville to manage the "Don Mason Service Company," which served as the basis for duping Netterville into playing the part of "Don Mason." Extensive testimony by Netterville and exhibits tending to support Netterville's theory, going far beyond Cheung's alleged potential testimony, were admitted at trial. Further, the conversation to which Cheung would have testified took place before Netterville undertook his duties as "Don Mason." It would therefore, not contradict evidence of Netterville's knowing complicity once he actually began acting as "Mason." In light of this, we cannot say that Cheung's testimony was "critical" to Netterville's defense, *United States v. Scallion,* 5 Cir., 1976, 533 F.2d 903, 912.

In sum, we note that the absence of the witnesses does not appear to have been critical to Netterville's defense.

■ *The balance.* Having evaluated the assertions of the appellants as to the four *Barker* factors, we weigh them to determine whether such prejudice accrued to any of the appellants of such a nature as to deprive them of their right to a speedy trial.

We conclude that the trial judge was correct in denying the appellants' motion to dismiss for lack of a speedy trial.

*Other Issues*

■ Netterville and Thatcher argue on appeal that the trial judge erred in giving the following instruction to the jury:

The law presumes that every man intends the natural and probable consequences of his own knowing acts. Wrongful acts knowingly or intentionally committed can neither be justified nor excused on the ground of innocent intent. The color of the act determines the complexion of the intent. The intent to injure or defraud can be presumed when the unlawful act which results in loss or injury is proved to have been knowingly committed. It is a well settled rule that the intent can be presumed and inferred from the results of the action.

Netterville argues vigorously that to instruct that intent is to be "presumed" rather than that it is inferable, from actions of the accused, amounts to plain error. He points out that intent is a critical element of the crime charged, and that his defense was "pitched" on lack of intent. It is true that we have disapproved use of "presumptive" instructions, *see United States v. Wilkinson,* 5 Cir., 1972, 460 F.2d 725, 733; but their use is reversible error only when they mislead the jury to the extent that they tend to reverse the burden of proof in the jury's mind, *id.* We must view the instruction complained of in the context of the full charge given the jury, *see, e. g., United States v. Green,* 5 Cir., 1974, 494 F.2d 820, 829, *cert. denied,* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 280; *United States v. Cisneros,* 5 Cir., 1974, 491 F.2d 1068, 1072. The complained-of instruction must remain uncured in the context of the full charge to require overturning the jury's verdict, *Poole v. Georgia,* 5 Cir., 1977, 551 F.2d 683, 685; *United States v. Wilkinson, supra,* 460 F.2d at 732.

■ We have reviewed the trial judge's instructions in this case and find that in the context of the entire charge the proper burden of proof was made unmistakably clear.[3] *See Poole v. Georgia, supra,* at page 685. In the present case, the words com-

---

**3.** For example, in addition to the complained-of language, the trial court also charged the jury as follows:

So the presumption of innocence alone is sufficient to acquit the defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt from all the evidence in the case.

. . . . .

plained of were not so misleading in the context of the entire charge as to require overturning the jury's verdict.

■ Thatcher and Watkins complain on appeal that the trial judge erroneously admitted testimony concerning alleged offenses extraneous to the indictment. The allegedly extraneous offenses complained of related to sales which were attempted and made pursuant to the DMI/ICU scheme but not charged in the indictment. To allow such evidence was not error; "the government is not limited to overt acts pleaded in proving a conspiracy. It may show other acts of the conspirators occurring during the life of the conspiracy." *United States v. Perez, supra,* 489 F.2d at 70.

■ Finally, Chambers argues that the trial court erred in allowing the government to examine witnesses in an impermissibly suggestive manner.[4] We have examined the record and find no objection to the government's examination by Chambers at trial; therefore, we could reverse on this issue only if we could find that to allow the prosecutor's questions amounted to plain error within the meaning of Rule 52(b), F.R. Crim.P. We find no error of this magnitude, and thus find this issue to be without merit.

In conclusion, we have examined the various contentions of the appellants and for the reasons given, find each to be without merit. Accordingly, we affirm the judgment of the trial court.

AFFIRMED.

> The burden is on the Government to prove each of these essential elements of the offenses charged beyond a reasonable doubt.
>
> . . . . .
>
> As stated before, the burden is always upon the prosecution to prove beyond a reasonable doubt every essential element of the crime charged; the law never imposes upon a defendant in a criminal case the burden of duty or calling any witness or producing any evidence.
>
> . . . . .
>
> Fraudulent intent is one of the essential elements of the offense of which the defendant is charged, and such intent must be clearly proved or inferred from the evidence beyond a reasonable doubt to warrant a conviction.

4. These assertions refer to the evidence that some DMI advertisements instructed interested readers to telephone a "Mr. Byrd" at DMI. Several witnesses testified that they talked by telephone with someone at DMI who identified himself as Mr. Byrd. Chambers complains that the prosecutor, through his manner of questioning, attempted to insinuate that Chambers, whose middle name is Byrd, was in fact this "Mr. Byrd."