UNITED STATES of America,
Plaintiff-Appellee,

v.

Juventino H. MARTINEZ, alias Willie
Gonzales, and Joe Ramon Rodriguez,
Defendants-Appellants.

No. 73–1951.

United States Court of Appeals,
Fifth Circuit.

June 26, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 23, 1974.

Manuel V. Lopez, Jr., San Antonio, Tex., Joe A. Rudberg, Dallas, Tex. (Court-appointed), for defendants-appellants.

William S. Sessions, U. S. Atty., Joel D. Conant, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

Appellants, Juventino H. Martinez and Joe Ramon Rodriguez, were jointly tried before a jury and convicted under a single count alleging a conspiracy under 21 U.S.C. § 963 to import marijuana contrary to 21 U.S.C. § 952(a), and to possess marijuana with intent to distribute contrary to 21 U.S.C. § 841(a)(1).[1] Numerous errors are alleged on appeal.[2] We reverse because of the trial court's comments and instructions to the jury, which deprived defendants of a fair trial.

Michael Bell was arrested in Laredo, Texas, on July 5, 1972 while driving a vehicle containing approximately 100 pounds of marijuana which he had obtained from Mexico. He agreed to cooperate with the Government and furnished information which subsequently led to the arrest and indictment of appellants, Joe Rodriguez and Juventino Martinez.

The only evidence at the trial which connected appellants with the offense charged came from the two acknowledged accomplices, Pete Herrera and Michael Bell, and Bell's wife, Julia.[3] The gist of the Government's testimony was that appellants employed Herrera to act as a runner to bring back marijuana from Mexico. Herrera in turn suggested that an acquaintance, Michael Bell,

---

1. Also charged in the indictment as defendants were Pete J. Herrera and Joe Martinez. Michael Bell was named as a coconspirator but not as a defendant. Herrera was granted a motion for severance and at the time of trial Joe Martinez had not been apprehended.

2. Appellant alleges:
   1. The indictment is fatally defective because it charges offenses not proscribed by the laws of the United States.
   2. The district court's instructions to the jury with respect to the elements of the crime charged amount to plain error.
   3. The remarks of the trial judge were prejudicial and constituted directions to the jury to return verdicts of guilty.
   4. The evidence is insufficient to support appellants' convictions.
   5. The district court's failure to instruct that corroboration of accomplice testimony

was necessary, combined with its erroneous instructions concerning circumstantial evidence, constituted prejudicial error.
   6. The district judge prejudicially erred in permitting the Government to question appellant Rodriguez concerning wrongful conduct for which no conviction had been obtained.
   7. Appellants' rights under the Fifth and Sixth Amendments were abridged by the trial court's actions concerning testimony sought to be elicited from Government counsel.

3. The only other witness called by the Government was United States Customs Agent McPhink who arrested Bell at Laredo. McPhink's knowledge of appellants was acquired through Bell.

might also be interested in the venture. Thereafter, Herrera approached Bell with the idea, received a favorable response, and introduced him to appellants Rodriguez and Martinez, who made the necessary arrangements to procure the contraband. During the months of June and July 1972, several trips were made to Mexico for the purpose of importing marijuana: on June 10 by Herrera and Bell, accompanied by their wives; on June 13 by Bell and *Joe* Martinez (the non-apprehended defendant at the time of the trial) ;[4] on June 25 by Bell and his wife, Julia; on July 5 by Bell, which trip resulted in his arrest while attempting to cross the border. The Government's evidence also showed that appellants either singly or jointly furnished and arranged for cars to transport the marijuana and that they compensated Bell for two successful trips occurring on June 25 and July 5.

Both appellants took the stand and testified to their innocence. Their testimony was diametrically opposed to that of Herrera, Bell and Mrs. Bell who, though admitting their complicity in the undertaking, cast appellants in the primary roles of organizers and directors of the operation. The jury was faced with the dilemma of choosing between two sets of conflicting testimony, and they rejected appellants' version. This credibility choice would not be disturbed on appeal were it not for the fact that the trial judge by repeated prejudicial remarks effectively directed a verdict of guilty.

Contrary to the great mass of the testimony of both Mrs. Bell and her husband, the trial judge expressed his opinion that the evidence showed that Mrs. Bell knew nothing about the purpose of the June 10 and June 25 trips to Mexico (the only two trips made by Mrs. Bell with her husband) until she returned home from the second trip. In his charge to the jury the trial judge said:

[T]here was a disagreement among counsel as to what one witness had said. And that particularly is the case of Mrs. Julia Bell. Counsel for the defendant repeated many times that on her last trip to Mexico she knew all about it before she left. Counsel for the Government challenged that and said, "No, that was not her testimony at all." She said that she was very suspicious but it was only on that second trip home, that after she had crossed the border she confronted her husband and knew at that time that he had been engaged in an unlawful enterprise. Who has the most correct recollection of that testimony? Does the defendant's counsel or does the Government's counsel? Frankly I have an opinion as to who has the better recollection, and I am entitled to express an opinion. I think the Government's attorney has the better recollection, however, the recollection of it is entirely for you. And you are to accept your version of the testimony and not that of counsel for the Government, counsel for the defendant, or the remarks of the Court. The jury is as free as the air to disregard any opinions expressed by either counsel or the Court and to determine the case solely on the evidence of the case.

The testimony of Mrs. Bell is somewhat contradictory. However, for the most part it shows not only that she was aware of the illegal conspiracy at least as early as June 24, 1972, one day prior to her second trip to Mexico, but that she was an active participant in it.[5]

---

4. See n. 1.

5. Mrs. Bell testified that she met the appellants Joe Ramon Rodriguez and Juventino Martinez (known to her as "Willie") around June 24, 1972. She was asked on direct examination (Tr. 29–31) :

Q. Now, on both of these trips, on June 10th and June 24th, did you receive any expense money for going down there?

A. Yes, we did.

Q. Okay. Who gave you the expense money?

A. Well, on the first trip it was given to Michael so I didn't even know what was going on. *The second trip was given to Michael and I together by Joe, himself.*

Q. Rodriguez?

A. Yes, sir.

On cross-examination Mrs. Bell reaffirmed the fact that she knew the illegal purpose of the trips to Mexico prior to the time she made her second and last trip with her husband.[6]

From the testimony of Mrs. Bell quoted in the margin it is apparent that she was a knowing participant in the conspiracy when she accompanied her husband to Mexico on June 25. The trial judge's recollection of her testimony as stated in his charge to the jury, that she was ignorant of the purpose of the venture, apparently stemmed from remarks of Mrs. Bell while being questioned on cross-examination relative to her husband receiving compensation for his activities as a runner. Contrary to her prior assertions, she stated that she was unaware of the activities of the conspir-

---

Q. How much did he give you?
A. He gave us $190 total. It was supposed to be $150 advance payment and $40 for expenses.
Q. All right. $40 for expenses, and $150 in advance?
A. Yes, sir.
Q. How much were you to be paid for a trip where you would go to Mexico and come back?
A. Around $300 or $350.
Q. On June 10th did you get paid the $300 for going to Laredo?
A. Not that I know of.
Q. But you weren't able to make the complete trip?
A. No.
Q. Now, on June 24th you were given $150, is that correct?
A. Right.
Q. Now, did you make the trip to Laredo?
A. Yes, we did.
Q. *And did you bring back a load of marijuana?*
A. *Yes, we did.* [Emphasis supplied.]
Mrs. Bell was further asked (Tr. 31–32):
Q. *Now, on June 25th did you have an occasion to talk with the two Defendants in this case about your trip to be made that weekend?*
A. *That Saturday, we did.*
Q. *Okay. That would be the 24th?*
A. *Right, sir.*
Q. All right. And who did you talk to to make the arrangements to go down to Mexico to bring back this load of marijuana?
A. *Well, we talked to Joe and Willie both.*
Q. Okay. Now, when did you actually make the trip that you discussed on the 24th with the two Defendants?
A. *The next day.*
Q. That would be the 25th?
A. Right.
Q. On Sunday?
A. Right.
Q. All right. How did you go down to Mexico on the 25th?
A. *By the car furnished by Joe.*
Q. All right. Who took you to get that car?

A. *Willie did.*
Q. The Defendant—excuse me, Juventino Martinez?
A. *Right. I don't know his other name.*
Q. All right. This Defendant over here?
A. *Right, sir.*
Q. Now at the time that he took you to get the car did he give you any instructions as to what you were to do when you got to Mexico?
A. Yes. He gave us a phone number to call when we got there. [Emphasis supplied.]

6. The witness was asked (Tr. 34):
Q. Mrs. Bell, how many trips have you made to Nuevo Laredo to bring marijuana back?
A. Do you mean myself?
Q. Yes.
A. Two. One that I knew of, and one I didn't know of.
Q. And one time you didn't know that you were going there to bring marijuana, is that correct?
A. Well, I found out after I had gotten back that that's why I went.
Michael Bell was also of the opinion that his wife knew of the purpose of the second trip. He testified on cross-examination as follows:
Q. She went with you how many times, once or twice?
A. Twice.
Q. And both times she knew that you were being paid to go over there, is that right?
A. The first time she was vague, she knew something was amiss. *The second time she knew exactly what was going on.*
Q. And she knew that you were going to bring marijuana?
A. *Right.*
Q. And the first time she knew that you were getting some money for going out there, and you were getting some money when you came back?
A. Yes.
Q. And she knew that the second time—the second time she was almost certain it was narcotics?
A. Yes. [Emphasis supplied.]

ators until she returned from the June 25 trip.[7]

█ █ We do not question the right of a trial judge to comment on the evidence or express his fair opinion of that evidence where the jury is cautioned that they are not bound thereby and the ultimate resolution of factual issues is left to the jury. United States v. Jacquillon, 5 Cir., 1972, 469 F.2d 380; United States v. Dopf, 5 Cir., 1970, 434 F.2d 205. Indeed, the judge's remarks can be extremely salutary in assisting a jury to sift through confusing and irrelevant evidence. However, "It is well known, as a matter of judicial notice, that juries are highly sensitive to every utterance by the trial judge, the trial arbiter, and that some comments may be so highly prejudicial that even a strong admonition by the judge to the jury, that they are not bound by the judge's views, will not cure the error." Bursten v. United States, 5 Cir., 1968, 395 F.2d 976, 982–983; United States v. Womack, 5 Cir., 1972, 454 F.2d 1337, 1343. This is the situation here. The trial judge's undue emphasis of his personal opinion of Mrs. Bell's noninvolvement in the marijuana traffic had the effect of nullifying the fact-finding function of the jury. Especially is this true where the trial judge's recollection of the testimony was substantially erroneous. There was no evidence to inculpate appellants except that which came from the testimony of the accomplices. In essence, the trial judge informed the jury that in his opinion Mrs. Bell was not an accomplice to the conspiracy. Mrs. Bell's testimony was damaging to appellants. Although the jury was told of their right to reject the judge's version of the testimony, his impression of Mrs. Bell's neutrality and nonparticipation in the criminal operation was further impressed upon the jury when he further commented:

> "And his [Bell's] actions with these people supported by the testimony of his wife, *who has neither been charged, or actually you could find from the evidence if you cared to was not actually involved in any of the criminal acts complained of,* although her husband readily admitted that he was, and he was being paid to do his job." [Emphasis supplied.]

Under these circumstances, the instruction by the trial judge that the jury was not bound by his opinion was of questionable value. Moreover, the court's instruction that the testimony of an accomplice should be received with caution and weighed with care doubtless had little effect on the jury's assessment of the testimony of Mrs. Bell, who, because of the remarks of the court, had been effectively removed from the category of an accomplice.

█ If the jury still entertained a reasonable doubt of appellants' guilt, that doubt was all but dispelled when the district judge, again commenting on the Government's evidence, said:

> "I would think that if you believed all those facts beyond a reasonable doubt *you wouldn't have much hesitancy, and you would be entitled, although I am not instructing you in any way because the deliberation is all yours, not mine. I think that you might reasonably find that the offense has been proved.* You have heard the defendants in this case, who have said absolutely nothing, they did not in any wise have anything to do with this." [Emphasis supplied.]

We have had occasion to hold trial judges' remarks similar to these as constituting an impermissible directed

---

7. Mrs. Bell was asked (Tr. 39):

Q. And you knew by then [June 26] this involved bringing narcotics across the border?

A. No, I didn't. Not until we came back. On the way back I questioned my husband about what he was doing.

Q. And you found out that he had received some money for going there but you didn't know what?

A. Yeah.

Q. But you suspected?

A. Yes.

verdict.[8] The error here is even more prejudicial when combined with the other remarks previously alluded to.

■ Another serious error asserted by appellants is the failure of the trial court to instruct the jury on the elements of the substantive crimes constituting the objects of the charged conspiracy, i. e., (1) to import marijuana and (2) to possess same with intent to distribute. There is nothing in the charge to the jury which apprised them of the definition, character or nature of the acts of importing, possessing, or distributing marijuana. Moreover, the trial judge omitted any reference to the substantive crime of possessing with intent to distribute marijuana, one of the objects of the charged conspiracy. Only once, during the entire charge, did the court attempt to inform the jury of the crime with which appellants were charged, when it instructed: "You, the jury, determine from all the facts and circumstances whether or not a criminal conspiracy existed between these two persons and others to import marijuana from Mexico into the United States."

■■ The district court also committed error in permitting the prosecution to elicit from appellant Rodriguez. on cross-examination the fact that he was carrying loaded pistols at the time of his arrest. The marijuana was seized from Bell at the Laredo, Texas bridge. Rodriguez was nowhere in that vicinity. Rodriguez' subsequent possession of firearms had no connection with the crime of which he was convicted. The defense objected to the line of questioning but the court admitted the testimony for the purpose of impeachment. It is well settled, of course, that convictions for felonies or for misdemeanors involving moral turpitude are admissible for impeachment of a defendant who testifies. Steele v. United States, 5 Cir., 1957, 243 F.2d 712; Daniel v. United States, 5 Cir., 1959, 268 F.2d 849; Hamilton v. United States, 5 Cir., 1969, 409 F.2d 928; United States v. Garber, 5 Cir., 1972, 471 F.2d 212. However, there was no conviction growing out of Rodriguez' having possessed the pistols, which could have justified the admission of the evidence. Nor can the evidence be justified under the theory that Rodriguez had put his reputation in issue, either by calling character witnesses, Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), or by false assertions on direct examination relative to his prior unlawful conduct, Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). This is not such a case. Under the circumstances, the evidence was improperly admitted. See, e. g., United States v. Davenport, 5 Cir., 1971, 449 F.2d 696.

■ Appellants' challenge of the legal sufficiency of the indictment warrants only brief discussion. Under the criteria discussed by the Supreme Court in Russell v. United States, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 1049, 8 L.Ed.2d 240 (1962), and the numerous cases cited thereat, we find the indictment sufficient. It contains the elements of the offense intended to be charged; it sufficiently apprises the defendants of what they must be prepared to meet, and protects them from being again put in jeopardy for the same offense. Nevertheless, the indictment contains a minor, technical and non-prejudicial error which may be amended on remand. See Russell v. United States, *supra*, 369 U.S. at 770, 82 S.Ct. at 1050. The indictment charges a conspiracy under 21 U.S.C. § 963 to possess marijuana with intent to distribute contrary to 21 U.S.C. § 841(a)(1), whereas the correct conspiracy statute governing an offense under section 841(a)(1) is 21 U.S.C. § 846. The language of the two conspiracy statutes is identical. The error was beyond a doubt harmless and is no ground for

---

8. *See, e. g.*, United States v. Williams, 5 Cir., 1973, 473 F.2d 507; United States v. White, 5 Cir., 1972, 459 F.2d 990; United States v. Lowry, 5 Cir., 1972, 456 F.2d 341; United States v. Womack, 5 Cir., 1972, 454 F.2d 1337; United States v. Dopf, 5 Cir., 1970, 434 F.2d 205; United States v. Garza, 5 Cir., 1970, 426 F.2d 949.

dismissal of the indictment. *See* Rule 7(c)(3), Fed.R.Crim.P.

In light of our remand we do not reach the question of sufficiency of the evidence. The two additional errors alleged by appellants are without merit.[9]

Reversed and remanded.