UNITED STATES of America, Plaintiff-Appellee,

v.

Gilberto Eugenio CARRENO and William Russell Bohannon, Defendants-Appellants.

No. 78–5415.

United States Court of Appeals, Fifth Circuit.

July 27, 1979.

Rehearing Denied Sept. 6, 1979.

Engel, Aronson, Fried & Cohn, Don S. Cohn, Miami, Fla., for defendants-appellants.

Linda Collins Hertz, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and CLARK and VANCE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Gilberto Eugenio Carreno and William Russell Bohannon appeal from their convictions on one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846, and one count of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Both appellants challenge the legality of the warrantless search and seizure that produced the cocaine and the admission of hearsay statements by an alleged coconspirator. Bohannon additionally challenges the sufficiency of the evidence. We affirm.

I.

The events surrounding the alleged cocaine conspiracy were orchestrated by Priscilla Maria Dominquez Laura, an indicted coconspirator who was tried separately from Carreno and Bohannon. On October 15, 1977, undercover DEA agents met Priscilla Laura at the apartment of an informant named John Rinieri. Negotiations began for a large cocaine sale. Several additional meetings took place and it was ultimately agreed that prior to undertaking any large-scale transactions, a smaller deal involving one ounce of cocaine would be made. At 1:00 a.m. on the morning of October 18, 1977, Laura arrived at John Rinieri's apartment in a burgundy 1974 Corvette. A police check of the license number revealed that the Corvette was registered to the appellant Bohannon. The DEA agents were to put $1600 "up front" for the deal. The agents produced the money, and

an exchange of one ounce of cocaine took place at 3:30 a.m. that morning. It was decided that a sale of half a pound of cocaine for $12,000 would take place at 11:00 a.m. that same morning, with the rendezvous to again occur at Rinieri's apartment.

The agents arrived at Rinieri's apartment as scheduled and saw the appellant Bohannon standing near his Corvette, which was parked in Rinieri's driveway. When Laura arrived on the scene, she walked over to Bohannon and conferred with him briefly before approaching the agents. Laura explained to them that Bohannon was a friend of hers who was assisting her in the cocaine deal. Laura then got into the DEA agent's car and said she was ready to conclude the deal. She took out a slip of paper on which was written, "Scott Williams, Room 306, Ramada Inn, Hallendale," and directed the agents to drive to that motel. Upon arrival, Laura entered the motel, and shortly after that Bohannon arrived in his Corvette. He entered the Ramada, came out about ten minutes later, and moved his Corvette to a parking area on the north side of the building. Bohannon then carried a brown garment bag and a thin attache case into the motel. Laura rejoined the agents outside and told them that the cocaine had not yet arrived. She made several more trips into the motel, each time returning and telling the agents that she would let them know when the package had come. The agents left for a brief lunch at a restaurant across the street from the Ramada, and upon their return at 2:50 p.m. Laura informed them that "the man" would be there in ten minutes. She remained with the agents until a blue 1977 Pontiac arrived with two men, the appellant Carreno and an alleged coconspirator named Jose Joaquin Garcia. After Carreno had parked, Laura told the agents that everything would soon be ready. Carreno entered the motel carrying a men's brown leather purse. Garcia meanwhile slid into the driver's seat of the Pontiac and remained in the parking lot with the engine running. Laura entered the motel. She returned after a few moments and asked for the money, saying that "the people" were ready. The two DEA agents started their car, a prearranged arrest signal to other surveilling agents, and Laura and Garcia were arrested. Two agents then proceeded to Room 306 of the motel and waited in the hall for about three minutes. When the door was opened about a foot from the inside, the agents barged in, knocking Carreno and Bohannon to the floor. In plain view on the floor of the room was a brown garment bag similar to the bag Bohannon had carried into the motel. A plastic bag filled with cocaine was protruding from the pocket of the garment bag. At trial a DEA agent testified that the garment bag containing the cocaine was "exactly like" the bag Bohannon was seen carrying into the motel.

Aside from the testimony of the DEA agent which recounted the above events, Garcia testified that he and Carreno were partners in the paperhanging business. On the day of the transaction, Carreno informed Garcia that he had to deliver some cocaine, and Garcia accompanied Carreno to Carreno's house, where Carreno picked up a plastic bag of cocaine. When they arrived at the motel, Carreno carried the cocaine into the motel inside of the men's brown leather purse.

## II.

■ The appellants first argue that the cocaine was improperly admitted because it was the fruit of an illegal search and seizure. The argument is without merit. The cocaine was found in plain view when the officers were legitimately in the room for the purpose of making a lawful arrest. There was no time to obtain a warrant once Laura's statement that the cocaine was ready established probable cause. We have upheld the seizure of cocaine under almost identical circumstances in *United States v. Gaultney,* 581 F.2d 1137 (5th Cir. 1978). *See also United States v. Juarez,* 573 F.2d 267, 274–76 (5th Cir. 1978); *United States v. Cushnie,* 488 F.2d 81, 82 (5th Cir. 1973).

■ The appellants next contend that the DEA agents' testimony concerning out-

of-court statements made by the alleged coconspirator Laura were improperly admitted. Although we have recently announced new rules governing the admission of coconspirator hearsay, we expressly made those rules prospective only. *United States v. James*, 590 F.2d 575, 583 (5th Cir. 1979) (en banc). At the time of this trial, the admission of a coconspirator's statement was governed by our decision in *United States v. Oliva*, 497 F.2d 130 (5th Cir. 1974), and we evaluate the admission of Laura's statements under the *Oliva* prima facie standard. *Oliva* held that before a hearsay statement can be used against a particular defendant, the government must introduce sufficient evidence, independent of the hearsay itself, to support a jury finding that the alleged conspiracy existed and that the defendant against whom the statement was admitted was a member of that conspiracy. 497 F.2d at 132–33. Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704, we must determine whether, from the independent evidence offered, "reasonable minds could conclude that the evidence is inconsistent with the hypothesis of the accused's innocence." *United States v. Warner*, 441 F.2d 821, 825 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58; *Oliva, supra*, 497 F.2d at 133–34.

■ As to Carreno, the direct and circumstantial evidence clearly established the existence of a conspiracy and his participation in it. Laura met with DEA agents on several occasions and arranged a transaction involving a large amount of cocaine. On the day of the proposed sale, she directed the agents to accompany her to the Ramada Inn for the purpose of consummating the transaction. Her actions at the scene of the proposed sale, as well as her delay tactics at earlier meetings, were clearly inconsistent with any inference that she was working alone. Meanwhile, Carreno informed Garcia that he had to make a cocaine delivery. Carreno picked up the cocaine at his house and proceeded to the same Ramada Inn that Laura had identified as the place for the sale. Carreno took the

cocaine into the motel, where he was arrested approximately fifteen minutes later in a motel room with the cocaine in plain view. Such evidence constitutes a prima facie case that Laura and Carreno were involved in a conspiracy to distribute cocaine, thereby justifying the admission of Laura's statements further implicating Carreno.

■ The links in the chain of evidence against Bohannon are all circumstantial. Bohannon's Corvette was used by Laura on the night that she consummated the preliminary one ounce cocaine sale. The next morning, Bohannon and his Corvette were at Rinieri's apartment, the point scheduled for the initial rendezvous on the major cocaine transaction, when the DEA agents arrived. When Laura got to the scene, she first conferred with Bohannon before approaching the agents with the news that the deal was ready to be completed. Laura directed the agents to the Ramada Inn in Hallendale, and Bohannon arrived at that same motel shortly after Laura and the agents got there. A slip of paper in Laura's possession had "Room 306" written on it, the same room where Bohannon was arrested. Bohannon carried a brown garment bag into the motel, a bag "exactly like" the brown garment bag containing cocaine that was found in plain view only a few feet from Bohannon in Room 306. No innocent or coincidental hypothesis reasonably accounts for this confluence of events. The independent evidence was sufficient to support a jury verdict that Bohannon knowingly participated in the conspiracy with Laura, and the hearsay was thus properly admitted.

If the evidence independent of Laura's statements was sufficient to support a jury's finding of knowing participation in the conspiracy, *a fortiori* the evidence—with Laura's inculpating statements included—was sufficient to support the verdict of guilt. That same evidence was sufficient to support the substantive count of possession with intent to distribute.

The convictions of Carreno and Bohannon are

AFFIRMED.