## UNITED STATES of America, Plaintiff-Appellee,

v.

## Walter METZ and Ronald D. Schiller, Defendants-Appellants.

### No. 78–5621.

United States Court of Appeals, Fifth Circuit.

Dec. 10, 1979.

Rehearing and Rehearing En Banc Denied Feb. 14, 1980.

---

William M. Moran, Thomas G. Murray, George D. Gold, Miami, Fla., for Metz.

Richard E. Young, Dallas, Tex. (Court-appointed), for Schiller.

Shirley Baccus-Lobel, Asst. U. S. Atty., Dallas, Tex., for plaintiff-appellee.

Before FAY, RUBIN and HATCHETT, Circuit Judges.

FAY, Circuit Judge:

Ronald Schiller and Walter Metz were convicted in the District Court for the Northern District of Texas of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (1976). Their points on appeal emanate primarily from the illicit confederation's magnitude of time, geography, and cast. Schiller complains that delay ensuant to the coordination of multiple defendants' prosecutions

violated his right to a speedy trial. Both Schiller and Metz contend that indictment and proof of a single complex conspiracy rather than multiple conspiracies created reversible errors in joinder of defendants, variance between indictment and evidence, admission of alleged coconspirators' extra-judicial statements, and the trial court's charge to the jury. Additionally, Metz challenges the sufficiency of evidence show-ing his participation in the far-reaching scheme, and asserts that even the evidence tending to implicate him was unlawfully seized in an illegal search of his home. Metz also argues that the trial court im-properly refused to compel purportedly ex-culpatory testimony from a coconspirator who invoked the constitutional privilege against self-incrimination. Finally, Metz complains that the prosecutor's closing ar-gument, characterizing Metz as a "dope pusher" active throughout the scope of the conspiracy, was inflammatory and unsup-ported by any evidence. We have reviewed these several complaints in detail. Finding no reversible error, we affirm the convic-tions of both appellants.

## FACTS

Posing as a large-scale narcotics supplier, federal Drug Enforcement Administration agent Paul Clayton first met Harold Old-ham in Los Angeles, California, in March, 1976. Oldham, the central figure in this complex conspiracy, informed Clayton that he could supply large quantities of cocaine. Not until August, 1977, however, did agent Clayton call Oldham to discuss a possible transaction. From August to November, 1977, Clayton, Oldham and others met in Dallas, Los Angeles, Miami, and the Cay-man Islands, to contrive a large cocaine transaction and to plan the laundering of the illegally obtained proceeds. Additional-ly, Clayton and another agent, Herbert House, consummated with Oldham a small-er preliminary transaction in Miami: on September 17, they exchanged $20,000 for one pound of cocaine. The plans for the larger deal culminated in the events tran-spiring December 11 through December 14, 1977.

In Dallas on December 11, agents Clayton and House agreed to buy from Oldham forty pounds of cocaine for $850,000. On December 12, they met as agreed at the Calder Holiday Inn near Miami, Florida. Needing time to acquire and mark govern-ment funds for the transaction, the agents arranged to plan with Oldham all the de-tails of the exchange the following evening. At 8:00 p. m. on December 13th, Clayton, House, and two other agents met Oldham at the Marriott Motel in Miami. With Old-ham were Shirley Ruggiero and John Bland. At one point, Ruggiero offered an immediate exchange of five pounds of co-caine, which was then at her home. Upon the agents' refusal to deal, she remarked that she would have to return the cocaine to the "stash pad" that night.

According to plan, the four undercover agents met Oldham, Ruggiero, and Bland at the Calder Holiday Inn the next morning. Appearing for the first time was appellant Schiller, who accompanied the other sellers. Oldham stayed at the motel until his arrest about 8:30 that night. Schiller, Ruggiero, and Bland [the sellers] travelled with the agents from the motel to the Opa Locka Airport where they inspected $850,000 cash held in a disguised government airplane. After the inspection, Bland stayed at the plane, while Schiller and Ruggiero left to get the cocaine. Surveilling agents deter-mined that Schiller first took Ruggiero to her house and then drove alone to the resi-dence of appellant Metz, where he stayed from 12:45 p. m. to 3:00 p. m. Schiller then returned to Ruggiero's house, picked up Ruggiero and her son, and drove to yet another motel, the Hialeah Holiday Inn, where Bland and the agents had obtained a room for inspecting and testing the cocaine. In the room, Schiller revealed that he had only one pound of cocaine. He proposed that the deal be finished in increments rath-er than in one exchange, apparently to pro-tect the cocaine supplier from theft. The agents vehemently rejected the proposal, citing the extensive delays that had already occurred throughout the day. Throwing the pound back to Schiller, they insisted on immediate production of the entire forty pounds. Schiller agreed to return to the

stash pad to seek release of at least five pounds.

Taking Bland, Ruggiero, and Ruggiero's son, Schiller drove to appellant Metz's home, where a surveilling agent saw Metz meet them at the door. After a fifteen minute stay, Schiller and the others left, returning to Ruggiero's home around 5:00 p. m. From there Bland telephoned the agents to inform them that they had the five pounds, but that Schiller wanted to exchange one pound first. Reluctantly the agents agreed. Schiller, however, did not proceed directly to the motel where the agents were waiting, but drove back to Metz's. There he stayed for over an hour. Not until 7:15 p. m. did Schiller, Ruggiero, Ruggiero's son, and Bland arrive at the motel room. Again they offered one pound. This time the agents kept the pound, claiming it as compensation for their expense and trouble.

Apparently sensing the futility of further negotiation without production of the cocaine, Schiller and the others left. After stopping at a pay phone to place several calls, they turned back toward the motel. Realizing that the four had not procured any more contraband and were not likely to, agents stopped and arrested them around 8:30 p. m.

Sporadic surveillance of Metz's residence throughout the day had revealed little significant activity until late in the evening. Around 10:30 p. m., a woman left Metz's townhouse. She had not driven far when she was stopped by government agents, who acted under their headquarter's instructions to determine whether contraband was being moved from the suspected stash pad. After searching the woman for weapons, the agents searched the car with consent of the woman, who was appellant Metz's wife. The agents found no contraband but nonetheless continued to detain and question Wanda Metz at length, informing her that the townhouse she had just left was a suspected stash pad for a large quantity of cocaine.

Meanwhile, drug enforcement agents at headquarters for the operation had decided to "secure" the Metz residence to prevent destruction of the cocaine suspected to be there. An agent holding Mrs. Metz so informed her and requested that she give them her house key and accompany them to the townhouse. Initially she refused, but agreed to surrender the key and go with them when she realized not only that they were going to secure the residence irrespective of her cooperation, but also that they would take her to jail immediately if she refused.

Upon their return to the townhouse shortly after midnight, one agent took the keys from Mrs. Metz's hand. She asked for them back, but the agent refused. Mrs. Metz then announced, "It's me, and I am with the police." The agent immediately opened the door. Inside were appellant Metz and Mrs. Metz's brother. Although Metz protested the warrantless entry, the agents went inside. They ordered Metz, his wife, and her brother to sit down. Pending issuance of a search warrant, the agents conducted no search, but did seize a lump of cocaine visible on the kitchen floor. Additionally, they observed tracing paper, a heat sealer, and a triple-beam scale on the refrigerator in the kitchen.

Appellant and his wife were taken to the agents' headquarters at 2:00 a. m. Agents remained in the townhouse until daylight, the search time authorized by a warrant issued at 3:30 a. m. At about 7:00 a. m., they conducted a search which netted 2.1 grams of cocaine. Agents found cocaine in the toilet and tub of an upstairs bathroom and in several places in the kitchen downstairs. This contraband the agents seized, along with a roll of paper towels similar to the paper towel which wrapped the pound of cocaine delivered earlier by Schiller.

## I. SPEEDY TRIAL

Appellant Schiller contends that delay in his arraignment and trial violated both the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1976), and the local speedy trial plan for the Northern District of Texas, which incorporated the statute's deadlines.[1] Schiller's arrest occurred December

---

1. The initial Plan for the Northern District of Texas for Prompt Disposition of Criminal Cases [Speedy Trial Act Plan] was enacted pursuant to provisions of the Speedy Trial Act

14, 1977, and his indictment came 64 days later, February 16, 1978. The statute at that time required indictment within 45 days of arrest. *Id.* at § 3161(b), (f). His arraignment came fourteen days after indictment, instead of ten days as prescribed by the statute. *Id.* at § 3161(c). Following a continuance granted to his codefendants without Schiller's objection, his trial commenced 172 days after arraignment, on August 21, 1978. The statute allowed only 120 days between arraignment and trial. *Id.* at § 3161(c), (g).

On appeal, Schiller contends that the trial court's denial of his motion to dismiss his indictment constitutes reversible error. He concedes that the Act's sanctions were not mandatory at the time of his trial. *Id.* at § 3163(c). Moreover, the local plan imposed no mandatory dismissal for delay. Speedy Trial Act Plan, III(10)(d). Consequently, only delay violating the sixth amendment would compel dismissal. *United States v. Traylor,* 578 F.2d 108, 109 (5th Cir. 1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41 (1979).

Balancing prosecutorial conduct against Schiller's, we find no unconstitutional delay. *See Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *United States v. Edwards,* 577 F.2d 883, 888 (5th Cir.), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). To determine whether Schiller was denied a speedy trial, we consider the length of delay, the reasons for delay, Schiller's assertion of his rights, and what prejudice resulted. *Barker v. Wingo,* 407 U.S. at 530, 92 S.Ct. 2182; *United States v. Carter,* 603 F.2d 1204, 1206 (5th Cir. 1979). In this case, the threshold inquiry is dispositive. The relatively brief delays Schiller encountered do not rise to the level of presumptive prejudice. Therefore, we need not consider other factors in deciding that Schiller was not denied the right to a speedy trial. *Barker v. Wingo,* 407 U.S. at 530, 92 S.Ct. 2182 (1972); *United States v. Edwards,* 577 F.2d at 888. We

do note, however, that Schiller did not object to the continuance granted to his codefendants, although he did move for dismissal after the indictment delay and did request severance prior to the continuance. *Barker v. Wingo,* 407 U.S. at 531–32, 92 S.Ct. 2182. Nor does Schiller allege negligence or bad faith on the government's part. *Id.* at 531, 92 S.Ct. 2182. Moreover, Schiller cites no specific prejudice to his defense or personal rights, but claims only that prejudice inheres in any delay. Absent a showing that he suffered some particular injury, such as lost evidence or prolonged pretrial incarceration, Schiller cannot establish a constitutional infraction requiring reversal. *Id.* at 532, 92 S.Ct. 2182; *United States v. Noll,* 600 F.2d 1123, 1127–28 (5th Cir. 1979).

## II. A SINGLE CONSPIRACY OR SEVERAL?

 Both appellants complain that their indictment was defective. They claim that it misjoined defendants because it alleged facts showing three discrete conspiracies, yet charged a single conspiracy comprised of several events. They enumerate as separate conspiracies with separate casts the preliminary transaction of September 17, the money-laundering scheme, and the aborted large-scale transaction of December 14. Accordingly, they argue that because misjoinder of defendants is inherently prejudicial, the trial court's refusal to dismiss the indictment is reversible. Fed.R.Crim.P. 8(b); *United States v. Lane,* 584 F.2d 60, 62 (5th Cir. 1978).

To determine whether misjoinder occurred, we consider whether the indictment's allegations, taken as true, establish a single conspiracy or several. *United States v. Levine,* 546 F.2d 658, 663 (5th Cir. 1977). In so doing, we consider whether the alleged facts reveal a "substantial identity of facts or participants" sufficient to meet the

requiring federal district courts to adopt procedures instituting compliance with the Act. 18 U.S.C. § 3165(e)(2) (1976). Replacing that plan

was another plan filed on June 20, 1978, and effective since July 1, 1979.

requirements of rule 8(b).[2] *United States v. Marionneaux*, 514 F.2d 1244, 1248–49 (5th Cir. 1975). Appellants correctly assert that Oldham's mere appearance in each phase of the conspiracy could not transform several conspiracies into a single scheme. *United States v. Levine*, 546 F.2d at 663. We find, however, that the indictment adequately shows a singular conspiratorial objective: a large-scale narcotics transaction. Adequately alleged as facets of that same cocaine distribution scheme were the plan to launder its illgotten proceeds, the preliminary sale on September 17, and the preparations for the December 14 transaction.

That the indictment did not charge appellants with active participation in each phase of the conspiracy does not effect misjoinder. *United States v. Wooldridge*, 572 F.2d 1027, 1029 (5th Cir.), *cert. denied*, 439 U.S. 849 and 851, 99 S.Ct. 150, 155, 58 L.Ed.2d 151, 154 (1978). Nor need the indictment have charged that appellants knew all the participants or details of the conspiracy, so long as it alleged their knowledge of the conspiracy's essential nature. *Id.*

■ Appellant's claim of prejudicial variance between the indictment and proof similarly must fail. To prove appellants' complicity, the evidence need not have shown either their knowledge of every phase of the conspiracy or their participation in each event. *Blumenthal v. United States*, 332 U.S. 539, 556–58, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Foreclosing a finding of variance, the proof adduced at trial adequately denoted not only appellants' knowledge of the single scheme with a single overriding objective, but also their knowledge of participation by others. *See id.* at 557, 68 S.Ct. 248. Evidence of Schiller's negotiations with agents, his viewing the cash to be paid, and his possession and offer of a pound of cocaine clearly indicated his knowledgeable cooperation. Proof implicating Metz is more sparse, but ample to denote his knowl-edge of the ultimate goal and his awareness of others' cooperative efforts to attain it. When the agents refused Shirley Ruggiero's offer to sell five pounds of cocaine the night before the scheduled large transaction, she remarked that she would have to return those five pounds to the stash pad. By that remark she revealed that her home was not the stash pad. Therefore, the next day's trips by the sellers, inevitably ending at either Ruggiero's or Metz's, strongly suggested that Metz's townhouse was the stash pad. Moreover, a surveilling agent testified that he saw Metz at the door of the townhouse at 5:00 p.m., thereby establishing Metz's presence during the course of other conspirators' visits. Finally, the search conducted on December 15 not only uncovered cocaine in Metz's house, but also revealed that disposal had occurred in several locations on different floors, suggesting that more than one person endeavored to eradicate any evidence of contraband. Since only two men were in the townhouse when police arrived with Mrs. Metz, the several places of disposal strongly implicate Metz's cooperation in the disposal of the cocaine.

■ This evidence of appellants' knowledgeable cooperation in the single confederation not only conformed the proof to the indictment, but also established an adequate basis for admission against Metz of alleged coconspirators' extrajudicial statements, which are nonhearsay under Fed.R. Evid. 801(d)(2)(E). That rule permits the admission of a defendant's coconspirators' statements, if made in furtherance of a conspiracy and during its course. *United States v. Smith*, 550 F.2d 277, 281 (5th Cir.), *cert. denied*, 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977). Because proof independent of the statements was sufficient in this case to establish a prima facie case of the conspiracy's existence and Metz's participation in it, the trial court properly admit-

2. Fed.R.Crim.P. 8(b) provides:

*Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or *in the same series of acts or transactions* constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count. (emphasis supplied)

ted the alleged coconspirators' statements. *See Glasser v. United States*, 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Oliva*, 497 F.2d 130, 132 (5th Cir. 1974); *United States v. Apollo*, 476 F.2d 156, 159 (5th Cir. 1973).[3] Metz does not suggest that no conspiracy existed, but only that he was not a member of it. Viewing the independent evidence already reviewed in the light most favorable to the prosecution, we cannot say that a reasonable jury necessarily would find that appellants played no part in a comprehensive agreement to possess cocaine with intent to distribute it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1941); *United States v. Warner*, 441 F.2d 821, 825 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). Moreover, the district judge provided the cautionary *Apollo* instruction, charging the jury not to consider any declarations against appellants by other alleged coconspirators until sure of the conspiracy's existence and appellants' complicity.

█ Because this evidence, independent of coconspirators' extrajudicial statements, would allow a reasonable jury to find Metz a conspirator, the aggregated evidence necessarily is sufficient to sustain his conviction. *United States v. Carreno*, 599 F.2d 680, 683 (5th Cir. 1979).

## III. SEARCH AND SEIZURE

█ Appellant Metz asserts error in the trial court's refusal to suppress incriminating evidence garnered in the search of his home. We agree with appellant that Mrs. Metz never consented to the agents' warrantless entry at midnight. The trial court, however, found that the agents had probable cause to believe cocaine was on the premises, under circumstances sufficiently exigent to validate the intrusion. We review this ruling mindful that the factual findings upon which it is based are reversible only if clearly erroneous. *United States v. Duckett*, 583 F.2d 1309, 1313 (5th Cir. 1978).

Throughout the day on December 14, surveilling agents had seen Schiller, Bland, and Ruggiero make several visits to appellant Metz's home, in circumstances implicating the townhouse as the storage site for the contraband. Each time the sellers promised the agents delivery of the cocaine, they travelled to Ruggiero's home or Metz's. Often one or more remained at appellant Metz's for several hours. Because Ruggiero's remark on the preceding night had ruled out her home as the stash pad, the agents' scrutiny began to focus on the Metz townhouse.

The arrest of Schiller, Ruggiero, and Bland at 8:30 that evening aborted the transaction. Thereafter, agents met at their headquarters to compare their observations. Correctly concurring that probable cause existed to believe that the Metz residence was indeed the stash pad, they initiated application for a search warrant. They also resolved to safeguard the cocaine from removal or destruction, cognizant of the delay preparation of the warrant would entail.

Accordingly, these agents at headquarters, informed of Mrs. Metz's departure, instructed the agents still watching the Metz townhouse to investigate. Questioning Mrs. Metz and searching her car uncovered no cocaine. Still believing the Metz townhouse to be the stash pad, however, agents returned to the townhouse with Mrs. Metz, who surrendered her key when threatened with jail. Over her protest, they used her key to enter the townhouse. The inefficacious and dilatory efforts to gain Mrs. Metz's voluntary cooperation vitiated any consent the agents may have sought. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). That the agents may have conducted an unlawful stop or that they used the key over protest, however, did

---

**3.** *Oliva* and *Apollo* were overruled recently in *United States v. James*, 590 F.2d 575, 579 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Nonetheless, the *Oliva* prima facie standard governs, rather than the substantial evidence standard announced in *James*, because *James*, effective prospectively thirty days from the date of the opinion, postdated appellants' trial. *See United States v. Robinson*, 591 F.2d 1202, 1204 (5th Cir. 1979).

not dispel the ongoing risk of the contraband's destruction. The delay incurred was not of the type or length which would ameliorate that emergency. *See G. M. Leasing Corp. v. United States,* 429 U.S. 338, 358–59, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). The agents still had probable cause to believe that cocaine was on the premises and to fear its imminent destruction. Consequently, the circumstances which would have permitted an earlier entry justified the later one. *Cardwell v. Lewis,* 417 U.S. 583, 595–96, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974). *See Roaden v. Kentucky,* 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); *United States v. Juarez,* 573 F.2d 267, 274–76 (5th Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978); *United States v. Gardner,* 553 F.2d 946, 947–48 (5th Cir. 1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978).

■ Appellant Metz complains that the agents' failure to knock and announce their authority rendered the entry unlawful, under the federal statute mandating such notice. 18 U.S.C. § 3109 (1976). Having failed to raise this issue before appeal, Metz forfeits any right to argue it now, absent a showing of plain error. *Fishing Fleet, Inc. v. Trident Ins. Co.,* 598 F.2d 925, 926 n.1 (5th Cir. 1979); *Evans v. Triple R. Welding & Oil Field Maintenance Corp.,* 472 F.2d 713, 716 (5th Cir. 1973). Even had the issue arisen below, however, Metz would not have prevailed. This court has recognized logical exceptions to the statute, at least two of which apply here. First, since compliance with the requirement could have induced destruction of evidence, agents need not have announced their entry. *United States v. Carter,* 566 F.2d 1265, 1268 (5th Cir.), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978). Second, announcement is not necessary if it would serve no useful function. *Wittner v. United States,* 406 F.2d 1165, 1166 (5th Cir. 1969). After Mrs. Metz's outcry at the door, any further statements by the agents would have been redundant.

■ Upon entry, the agents merely secured the premises, conducting no search.

By this conduct, they complied with the rule limiting the scope of warrantless searches to the rationale excepting the search from the warrant requirement. See, *Cupp v. Murphy,* 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *United States v. Afanador,* 567 F.2d 1325, 1328 (5th Cir. 1978). The entry being lawful, the agents' seizure of a small lump of cocaine from the floor beneath the kitchen counter merits exception to the warrant requirement under the plain view doctrine. *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *United States v. Roach,* 590 F.2d 181, 184–85 (5th Cir. 1979).

■ A more thorough search pursuant to the warrant revealed additional incriminating evidence. Appellant Metz challenges its admission, attacking the validity of the warrant itself under the affidavit truthfulness standard announced in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). If indispensable to a finding of probable cause, an affiant's false statement made knowingly, intentionally, or with a reckless disregard for the truth voids the warrant and bars its evidentiary fruits. Metz's attack falls far wide of the mark. He neither alleges nor offers proof that specific statements by the affiant, a government agent, were falsehoods made deliberately or with a reckless disregard for the truth. *See id.* at 171, 98 S.Ct. 2674. Moreover, probable cause for a search would have existed even absent any unjustifiable reliance on the seller's promises to deliver forty pounds of cocaine. Agents' independent observations of the Metz residence and its visitors, along with the sellers' actual production of a pound of cocaine, constituted ample grounds for a warrant. *See id.* at 171–72, 98 S.Ct. 2674. Deeming the entry, search, and seizure lawful, we find no clear error in the district court's admitting the fruits into evidence.

## IV. EXCULPATORY EVIDENCE

### A. *Schiller*

■ Appellant Metz asserts error in the trial court's refusal to sever his trial from Schiller's to accommodate Schiller's prof-

fered exculpatory testimony, unavailable in a joint trial because Schiller planned not to take the witness stand. Metz assumes a heavy burden, since the trial court's severance denial is reviewable only for abuse of discretion. *Byrd v. Wainwright,* 428 F.2d 1017, 1018 (5th Cir. 1970). Failing to make a clear showing that the denial created prejudice denying him a fair trial, Metz does not sustain that burden. *See United States v. Martinez,* 486 F.2d 15 (5th Cir. 1973). First, Metz made no clear showing of specific and significant exonerative facts to which Schiller would testify, but "merely hinted at the substance" of the proffered testimony. *United States v. Marable,* 574 F.2d 224 (5th Cir. 1978). *See Byrd v. Wainwright,* 428 F.2d at 1020. The trial court further determined that even what was offered merely duplicated other evidence. Second, Schiller's purportedly exonerative testimony lacked credibility because it would not contravene any apparent penal or other interest of Schiller. *See United States v. Alfonso,* 552 F.2d 605, 616 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977). Finally, judicial economy considerations called for joint trial, especially in this complex conspiracy case. *See Byrd v. Wainwright,* 428 F.2d at 1020. To have granted Metz's belated motion for severance, made after trial had commenced, would have exacerbated that strain. We conclude that the denial of severance was not an abuse of discretion.

## B. *Bland*

### 1. The Fifth Amendment Privilege

 Appellant Metz claims that the trial court erred in sustaining the assertion of fifth amendment privilege by John Bland, Metz's codefendant. Metz sought from Bland purportedly exculpatory testimony but was deterred by Bland's invocation of his right not to incriminate himself. Bland previously had pled guilty to the federal conspiracy charge and was serving his sentence. Consequently, he was not subject to further federal prosecution. Bland nevertheless refused to testify for Metz, unsure whether he would risk state prosecution

and fearful that his testimony, exculpating Metz but inculpating other codefendants, would subject him to danger in prison.

To ascertain the validity of Bland's fifth amendment claim, the trial court properly appointed counsel and questioned Bland, scrutinizing his rationale for refusing to testify. *Rogers v. United States,* 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951); *United States v. Wilcox,* 450 F.2d 1131, 1136–37 (5th Cir. 1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 787 (1972). That inquiry satisfied the trial court that by testifying Bland might subject himself to state prosecution. The substantial possibility of prosecution sufficed to excuse Bland. *Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *United States v. Melchor Moreno,* 536 F.2d 1042, 1046–47 (5th Cir. 1976). Appellant Metz asserts that the state's failure to prosecute within the time limits of Florida's speedy trial provision, Fla.R.Crim.P. 3.191(a)(1), relieved all risk of prosecution. Too many variables affect the time limits of that rule for the trial court to have been sure that Bland faced no risk of prosecution. *See, e. g.,* Fla.R.Crim.P. 3.191(d)(2). Absent any showing that the trial court abused its discretion in resolving the validity of Bland's claim, the decision must stand. *United States v. Melchor Moreno,* 536 F.2d at 1050 (5th Cir. 1976).

Appellant Metz further contends that, even if valid as to some matters, Bland's fifth amendment invocation embraced not only privileged testimony but also collateral matters posing no threat of prosecution. He argues that to elicit from Bland a statement negating any meeting with Metz on December 14, 1977, would not necessarily raise issues incriminating to Bland. We recognize the strictures against blanket invocation of the fifth amendment privilege. *Id.* at 1049. Nonetheless, we refuse to overturn a determination, made in the trial judge's informed discretion, that to compel any testimony from Bland would violate his constitutional privilege. *See United States v. Lacouture,* 495 F.2d 1237, 1239 (5th Cir.), *cert. denied,* 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974).

### 2. Bland's Prior Sworn Statement

Metz next asserts that the trial court's refusal to compel Bland's testimony made Bland "unavailable," under Fed.R. Evid. 804(b)(2). Therefore, Metz argues, the trial court should have admitted Bland's prior sworn statement taken before trial by the attorney for appellant Schiller. In that statement Bland professed never to have known or seen appellant Metz during the course of the conspiracy to which he had pled guilty. The trial judge refused to admit the statement as an admission against penal interest, a hearsay exception under Fed.R.Evid. 804(b)(3). The trial court found that Bland's statement, taken in a nonadversarial setting, lacked the clear corroboration required by Rule 804(b)(3) to guarantee its trustworthiness. *See United States v. Alvarez*, 584 F.2d 694, 701 (5th Cir. 1978); *United States v. Bagley*, 537 F.2d 162, 168 (5th Cir. 1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977). In his efforts to compel admission of Bland's statement, appellant Metz proffered as corroboration Bland's repeated reaffirmance of the statement. Metz also drew attention to the testimony of Metz's alibi witness, which placed Metz away from the townhouse on December 14. Additionally, appellant Metz stressed that the only agent claiming to have seen Metz at the townhouse changed a former representation that he had never seen him. Seeking to establish his absence from the townhouse, Metz argued that the agent's former testimony and the subsequent change corroborated Bland's statement implying Metz's absence.

Such proffers of corroboration do not convince us of clear error in the trial court's refusal to admit the statement under Rule 804(b)(3). *See United States v. Bagley*, 537 F.2d at 165. Moreover, having failed to meet the corroboration standards of one hearsay exception, the statement must also fail the equivalent trustworthiness standards of Fed.R.Evid. 804(b)(5). We agree with the trial court that the same proffers could not establish such circumstantial guarantees of trustworthiness as to mandate admission of Bland's statement under the residual hearsay exception. *United States v. Alvarez*, 584 F.2d at 702 n.10.

### V. CHARGE TO THE JURY

Appellant Metz through new counsel on appeal seeks reversal because the judge and attorneys at trial held a preliminary jury instruction discussion off the record before the recorded formal charge conference. Although the Court Reporter Act, 28 U.S.C. § 753 (1976), does mandate the recording of "all proceedings in criminal cases had in open court," *id.* at § 753(b)(1), trial counsel seized his opportunity to record objections during the formal charge conference. Consequently, no significant omission from the record occurred. Accordingly, we can conclude affirmatively that none of Metz's substantial rights was infringed. See *United States v. Selva*, 559 F.2d 1303, 1306 & n.5 (5th Cir. 1977).[4]

Moreover, we have considered that substance of the trial court's charge as a whole and find it a correct statement of the applicable law. *See United States v. Chandler*, 586 F.2d 593, 606 (5th Cir. 1978), *cert. denied*, 440 U.S. 927, 99 S.Ct. 1262, 59 L.Ed.2d 483 (1979). The judge adequately conveyed to the jury the law pertinent to Metz's theory of defense, correctly refusing to recount for the jury the factual arguments ensconced in Metz's requested instruction. *See United States v. Barham*, 595 F.2d 231, 244 (5th Cir. 1979). The judge informed the jury that "mere association" with conspirators could not establish Metz's complicity. That language disclosed the applicable legal principle without detracting from the significance of Metz's presence at the stash pad.

---

**4.** We also note that Metz's appellate counsel was present at trial as counsel to one of Metz's codefendants. Although we employ the more exacting standard of review commanded by the presence of different counsel on appeal, *see United States v. Selva*, 559 F.2d 1303, 1306, the lesser standard would have satisfied the underlying policy dictates in these circumstances. For a criticism of the *per se Selva* rule, *see United States v. Smith*, 591 F.2d 1105, 1109 n. 1 (5th Cir. 1979).

Metz further asserts error in the trial court's rejection of a requested instruction on sole, joint, actual, and constructive possession. We review this claim under the plain error standard because of Metz's failure to object to the omission. *See United States v. Marino*, 562 F.2d 941, 945 (5th Cir. 1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978). Metz contends that the omission erroneously deprived the jury of knowledge of the elements of the conspiracy's criminal objective. We fail to see how the requested instruction would have helped the jury assess Metz's conspiratorial role, although a more detailed definition of the substantive crime underlying the conspiracy might have been desirable. *See United States v. Martinez*, 496 F.2d 664, 669 (5th Cir.), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 627, 42 L.Ed.2d 646 (1974). Having reviewed the charge in its entirety, we find that the trial court adequately instructed the jury on the elements of the crime charged. *See United States v. Marino*, 562 F.2d at 945.

Finally, both appellants reassert their earlier argument that the evidence revealed multiple conspiracies. They claim error in the trial court's refusal to instruct the jury to acquit if the government proved only appellants' participation in one or more of several conspiracies rather than in the single conspiracy alleged. Appellants argue correctly that as a general rule, the jury decides whether one conspiracy or several existed, *United States v. Becker*, 569 F.2d 951, 961 (5th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). Whether the jury should ever reach that question, however, is for the trial judge's determination. As previously stated, the judge in this case correctly concluded that both the indictment and the proof at trial revealed but a single scheme. Absent a variance between the two, he need not have charged the jury on multiple conspiracies. *See United States v. Elliott*, 571 F.2d 880, 905–06 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Ashley*, 555 F.2d 462, 467–68 (5th Cir.), *cert. denied*, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977).

## VI. PROSECUTOR'S CLOSING ARGUMENT

Finally, appellant Metz claims that the prosecutor's closing argument brought about the guilty verdict through prejudicial appeals to the jury unsupported by the evidence. Metz cites as examples the prosecutor's characterization of Metz and other defendants as "dope pushers," his reference to the drug-related problems of a venireman, and his emphasis on the national scope of the drug problem and appellant's role in it. We do not find the cumulative effect of the prosecutor's persuasive efforts either unduly prejudicial or excessively inflammatory. *See United States v. Soto*, 591 F.2d 1091, 1101 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979). The "dope pusher" characterization falls safely on the legal side of the line between improper expression of the prosecutor's opinion and entirely appropriate advocacy of conclusions to be drawn from the evidence. *See United States v. Siegel*, 587 F.2d 721, 727 (5th Cir. 1979). As we have remarked before, "[u]nflattering characterizations of a defendant do not require a new trial when such descriptions are supported by the evidence." *United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). *See also United States v. Goodwin*, 492 F.2d 1141 (5th Cir. 1974) (characterization as "fugitive" inflammatory when irrelevant and unsupported by any evidence).

## CONCLUSION

Seventeen people were indicted in this complex conspiracy which ranged from California to the Caribbean. Trying such a complex case commands considerable effort from all involved. We are convinced that appellants received from these labors a fair trial commensurate with all constitutional standards and statutory mandates. Accordingly, their convictions are AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

Because I do not believe the record shows probable cause for the search of the Metz residence, I dissent.